IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | NO. 09-755-1 |
| | : | |
| MARKEITH JOHN WEBB | : | |
| | : | |

## OPINION

**Slomsky, J.**                                                      **March 29, 2011**

## I.      INTRODUCTION

Before the Court is Defendant Markeith John Webb's Motion for Judgment of Acquittal

and/or New Trial (Doc. No. 90) and the Government's Response in Opposition (Doc. No. 100).

After a four-day jury trial, concluding on December 3, 2010, Defendant was found guilty of the

charges contained in a Superceding Indictment.  The instant post-trial Motion followed.  Because

the Court finds that (1) the evidence presented by the Government is sufficient to establish

Defendant's guilt beyond a reasonable doubt on the charges in both Counts of the Superceding

Indictment, and (2) the interest of justice does not require a new trial, the Court will deny

Defendant's Motion.

## II.     PROCEDURAL HISTORY

On December 1, 2009, Defendant was charged with armed bank robbery of the branch of

the Lafayette Ambassador Bank located in Easton, Pennsylvania (the "Bank") in violation of

18 U.S.C. § 2113(d).  On or about January 13, 2010, Defendant, while represented by prior

defense counsel, engaged in an off-the-record proffer with the Government during which he

provided details about the robbery.  (Doc. No. 90 ¶ 2.)  Thereafter, Defendant became dissatisfied with his counsel, who in turn filed a Motion to Withdraw (Doc. No. 19).  On May 26, 2010, the Court granted the Motion and appointed new counsel for Defendant (Doc. No. 30).  New counsel has represented Defendant on a renewed pretrial motion and at trial and continues to represent Defendant to the present time.

On September 1, 2010, before the date of trial, Defendant filed *pro se* a Motion for a Franks hearing (Doc. No. 48).  On September 27, 2010, new counsel for Defendant filed a Restated Motion for a Franks Hearing (Doc. No. 57).  On November 10, 2010, the Superceding Indictment was returned by the Grand Jury, charging Defendant with armed bank robbery in violation of 18 U.S.C. § 2113(d), as well as the use of a firearm in connection with a crime of violence in violation of 18 U.S.C. § 924(c)(1).  On November 18, 2010, the Court heard oral argument on the Restated Motion for a Franks Hearing.  On November 24, 2010, the Court entered an Order denying the Motion (Doc. No 75).  An Opinion containing the reasons for denying the Motion was also filed (Doc. No. 74).

On November 30, 2010, trial commenced with jury selection.  The trial lasted four days, concluding on December 3, 2010, when the jury found Defendant guilty of the two charges in the Superceding Indictment.  (December 3, 2010 Trial Transcript ("12/3/10 Tr.") at 80:12–81:24.) On December 16, 2011, counsel for Defendant filed the instant Motion for Judgment of Acquittal and/or New Trial (Doc. No. 90).  On January 19, 2011, the Government filed a Response in Opposition.  (Doc. No. 100).  On February 10, 2011, the Court heard oral argument on the post-trial Motion.  For reasons that follow, the Motion for Judgment of Acquittal and/or New Trial will be denied.

### III.    SUMMARY OF EVIDENCE PRESENTED AT TRIAL

On June 5, 2009, just before eleven o'clock in the morning, a lone gunman robbed the Bank.  Video surveillance recordings recovered from the Bank show the perpetrator wearing gloves and a mask over the lower portion of his face, and carrying a gun.  The perpetrator seen in the video is an African American male.

Defendant, an African American male, was charged with committing the robbery in the Superceding Indictment, which contains two counts: Count One charges armed bank robbery in violation of 18 U.S.C. § 2113(d); Count Two charges the use of a firearm in connection with a crime of violence in violation of 18 U.S.C. § 924(c)(1).

In his post-trial Motion, Defendant challenges the sufficiency of the evidence presented by the Government on both counts, and seeks a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(c)(1).  At trial, the Government proved its case with direct and circumstantial evidence.  The evidence consisted of: (1) testimony of bank tellers and customers who witnessed the robbery and specifically identified Defendant as the robber; (2) testimony of employees of an Exxon gas station where Defendant exchanged red dye-stained money for different bills shortly after the robbery; and (3) testimony of law enforcement personnel who testified that the money Defendant exchanged as well as the money found on Defendant at the time of his arrest, and stains on the upholstery of a vehicle Defendant drove on the day of the robbery, all tested positive for red dye and tear gas that are used in bank security packets or devices.  Based upon the evidence presented at trial and viewing the evidence and all reasonable inferences drawn therefrom in the light most favorable to the Government as the verdict winner, there is sufficient evidence to support the jury's verdict.

A.     Witnesses To The Robbery

1.     *Shaprese Thomas*

Shaprese Thomas was working at the drive-up window of the Bank when someone ran into the Bank and said something to the effect of, "don't f'ing move." (December 1, 2010, Trial Transcript ("12/1/10 Tr.") at 167:23-168:1.) Thomas responded by turning away from the drive-up window toward the noise. She observed a heavy-set African American male "hopping the counter near the first teller station with gun in hand." (Id. at 168:4-14.) The perpetrator was wearing "something black over his mouth" and nose and when he jumped over the counter "it came down a little, and he pulled it back up." (Id. at 169:8:-18.)

The perpetrator took money from the drawer of another teller, Alexandra Jimenez, and ran past Thomas toward the drawer of teller Sally Chrin. (Id. at 169:23-25.) As the perpetrator ran toward Thomas she dropped money that she had been holding. (Id. at 182:14-21.) The perpetrator then ran out of the Bank and Thomas watched him through the drive-up window as he ran away. (Id. at 170:17-22.) Thomas saw the dye-pack on the robber explode and saw smoke "traveling behind" him. (Id. at 170:24-25.)

When the perpetrator's mask came down, Thomas saw his face and recognized him as someone who had been in the Bank before. (Id. at 171:7-14.) Thomas eventually realized that the perpetrator had visited the Bank with an elderly customer, Mattie Graham. (Id. at 172:4-16.) Thomas estimated that she had seen the perpetrator in the Bank with Graham two or three times prior to the robbery. She assumed he was her grandson. (Id. at 172:17-23.) Thomas identified Defendant Markeith Webb as the man she believed to be Graham's grandson and as the man who robbed the Bank on June 5, 2009. (Id. at 182:15–183:10.)

4

On cross-examination, Thomas stated that after the robbery, she started to fill out a "robbery kit," which included a picture of a man with blank features and instructions to the victim of a robbery to draw in the features of the robber. (Id. at 186:25–188:1.) No other tellers or witnesses started to fill out the form because the police arrived and there was no need to do so. (Id.) Thomas did not complete her form and did not provide it to anyone and she does not know what happened to it. (Id.) Thomas had written a description of the perpetrator on an envelope and she provided that envelope to one of the investigating officers. (Id. at 188:3-24.)

At trial, the jury viewed the Bank surveillance videos and photographs of the crime scene, admitted into evidence as Government Exhibits 3-10 and 12-18, and Thomas explained to the jury what the pictures and videos portrayed.

2.     *Sally Chrin*

Sally Chrin saw the perpetrator enter the Bank and heard him order everyone not to move. (12/1/10 Tr. at 142:1-2.) He jumped over the low wall separating the customer side from the teller side and landed on the counter near teller Alexandra Jimenez. (Id. at 3-7.) The perpetrator wore a black handkerchief that covered his nose and mouth and he had a gun in his hand. (Id. at 142:12-18; 143:8.) When the perpetrator jumped over the wall, Chrin observed the mask or "handkerchief" fall down. (Id. at 148:20–149:2.) Chrin saw him grab money from teller Jimenez's drawer and then move toward teller Thomas, who dropped money she had been holding. (Id. at 143:10-18.) Chrin then heard a customer, Joseph Lombardo, tell the perpetrator to "leave those girls alone" and she heard the perpetrator yell something in response. (Id. at 150:18–151:3.)

The robber held the gun a few inches from Chrin's face while telling her not to move.

5

(Id. at 144:1-7.)  He then took packets of money from Chrin's drawer, including a dye-pack, and left the Bank.  (Id. at 144:10-11.)  Chrin watched through the drive-up window as the perpetrator ran away from the Bank while apparently putting money in the front of his shirt.  (Id. at 144:19–145:5.)  She saw the dye-pack explode.  (Id. at 145:7.)

After the robbery Chrin realized that the perpetrator was the grandson of a customer of the Bank.  (Id.)  Chrin estimated that she had seen the perpetrator in the Bank approximately three to five times prior to the robbery.  (Id. at 151:4-7.)

3.      *Joseph Lombardo*

Joseph Lombardo, a customer at the Bank, was standing at a teller station when a man who appeared to be 25 to 30 years of age ran up to the entrance to the teller's area and jumped over the "gate" to approach the tellers and rob them.  (12/1/10 Tr. at 111:12-17, 19-25.)  The perpetrator was wearing a "black scarf or something covering the lower part of his face."  (Id. at 112:14-17.)  When the perpetrator jumped over the gate, the scarf or mask slipped down and Lombardo caught a "glimpse" of a portion of his face.  (Id.)

When the robber was on the teller's side of the counter, Lombardo noticed that he was holding a gun.  (Id. at 113:14-18.)  Lombardo witnessed the perpetrator showing teller Alexandra Jimenez that he had a gun and estimated that the perpetrator was approximately two feet away from Jimenez at the time.  (Id. at 114:2-6.)  The perpetrator proceeded toward teller Shaprese Thomas, who got scared and threw into the air money that she had been holding.  (Id. at 114:21-25.)  The perpetrator next approached teller Sally Chrin and showed her the gun.  (Id. at 115:1-2.)  Lombardo told the perpetrator that he was scaring everyone and that he should just put the gun down.  The perpetrator told Lombardo to "shut up."  Lombardo repeated his statement and the

perpetrator responded, "shut up, or I'll shoot you." (Id. at 115:3-7.) At trial, Lombardo explained to the jury what the Bank surveillance videos depicted. (Id. at 120:12–125:14.)

Lombardo testified about his familiarity with guns. (Id. at 115:23-15.) He first handled a gun when he was in elementary school and his father taught him how to shoot. (Id. at 116:16-23.) One of Lombardo's relatives owned a gun shop and he frequented the shop when he was growing up. (Id. at 116:7-10.) Lombardo was confident in his ability to identify different types of guns. (Id.) He owns guns and rifles and knows how to shoot and clean them, and he was in the military where he used various types of guns. (Id.) Lombardo said that he was able to get a good look at the perpetrator's gun and that he thought it was a 9 millimeter, black, semi-automatic. The top part of the gun, the slide, was flat and black and the grips underneath the gun were dark. Further, Lombardo testified that where the slide met the frame, the gun was shiny as if either "the bluing was wore" or the serial number of the gun had been ground off. (Id. at 118:2-4.)

4.    *Alexandra Jimenez*

Alexandra Jimenez testified that on June 5, 2009 a man entered the Bank and came toward Jimenez's teller booth. He told her to open the "half wall" or low door next to her booth that separated the teller side of the counter from the customer side. (12/1/10 Tr. at 63:1-5.) The man banged a gun on the door. (Id.) Jimenez described the sound of the banging as something heavy and as metal hitting the wood of the door. (Id. at 64:6-17.) As Jimenez went toward the door to open it, the perpetrator jumped over the door and entered the teller side of the counter. (Id. at 63:7-9; 64:21-65:1.) He was wearing gloves and a mask that covered the lower portion of his face. (Id. at 65:3-18, 22-23.) He took money from Jimenez's open teller drawer and then

7

walked toward teller Thomas, who dropped money she was holding.  (Id. at 66:1-3.)  The

perpetrator waived the gun at teller Sally Chrin and told her to get away from the drawer.  (Id.)

He then took money from Chrin's drawer.  (Id.)  He placed the money in his shirt, and seemed to

be wearing layers of clothing.  (Id.)  After he left the Bank, Jimenez, Thomas, and Chrin looked

out the drive-through window and watched the robber flee.  (Id. at 67:1-10.)  A few moments

later Jimenez witnessed an orange cloud of smoke, caused by an explosion in the bait money that

the perpetrator had taken.  (Id.)

  B.  <u>Post-Robbery Witnesses</u>

    1. *Kelly Hart*

  Kelly Hart, a regional manager of the Lafayette Ambassador Bank, was working in the

main office located in Easton, Pennsylvania on June 5, 2009.  (December 2, 2010, Trial

Transcript ("12/2/10 Tr.") at 9:16-10:11.)  Hart has been a regional manager for the Lafayette

Ambassador Bank for approximately fourteen years and has worked for the bank for a total of

twenty-three years.  (Id. at 9:18-22.)  The Bank is a traditional style branch with four teller

windows in the lobby, a drive-up window, three offices, and a lobby.  (Id. at 11:3-5.)  There are

sixteen surveillance cameras in the Bank, located throughout the lobby, at the entrance to the

Bank, and in the offices.  (Id. at 11:22–12:3.)  The Bank uses a digital recording system (DVR)

and images are captured "camera by camera.  So it's not continuous."  (Id. at 12:16-19.)

  Hart learned of the robbery approximately five minutes after it occurred.  She went to the

Bank, arriving about ten minutes later.  (Id. at 12:18-13:2.)  She assisted in an audit to determine

how much money had been taken from the Bank.  (Id. at 13:8-14.)  Hart concluded that $1,100

was missing from Alexandra Jimenez's drawer and $3,565 missing from Chrin's drawer.  (Id. at

14:3-7; 14:19-21.)  The total amount lost in the robbery was $4,665.  (Id. at 14:22-24.)[1]

Hart described "dye-packs."  A dye-pack is a device that is kept in a teller drawer and looks like a pack of twenty-dollar-bills.  (Id. at 15:23–16:7.)  It is about the thickness of a stack of fifty bills and contains five bait bills.  (Id.)  Within each dye-pack is a sensor that is set off when it is removed from the building.  (Id. at 16:8-10.)  The dye-pack contains tear gas and red dye.  (Id.)  The Bank uses red dye exclusively.  (Id. at 16:17-22.)

At trial, Hart examined Government Exhibit 101, bank statements for Mattie Graham, the grandmother of Defendant.  (Id.  at 19:19-24.)  According to Hart, the records show that Mattie Graham opened an account at the Bank on January 8, 2007 and that she remains a customer of the Bank.  (Id. at 20:4-12.)

Hart testified that the Bank's business is to provide financial services to customers and that it is in fact a "bank."  (Id. at 20:24–21:5.)  She further testified that customers' deposits are insured by the Federal Deposit Insurance Corporation (FDIC).[2]  (Id. at 21:17-21.)

2.    *Heather Marciano*

Heather Marciano is a former employee of the Square One Exxon on 15th Street in Easton, Pennsylvania (the "Exxon").  (12/2/10 Tr. at 36:10-23.)  The Exxon is a convenience

---

[1]    Hart explained that each teller drawer contains "bait bills," which consist of five twenty-dollar-bills with serial numbers recorded by the Bank.  (Id. at 14:25–15:5.)  A total of $200 in bait bills, or ten twenty-dollar-bills, were taken in the robbery.  (Id.  at 15:6-18.)  The Government, however, did not present evidence linking the bills recovered directly to the bills taken from the Bank through matching serial numbers.

[2]    The Government offered into evidence as Government Exhibit 102, a "Certificate of Proof of Insurance Status," dated September 11, 1998, with a certification by the Assistant Executive Secretary of the FDIC that the Bank is insured by the FDIC and was insured at the time of the robbery.  (Id. at 21:23–24:1.)

store and gas station. Marciano was employed at the Exxon on June 5, 2009 – the day of the

robbery. (Id. at 37:2-4.) She was friendly with Defendant and they had each other's cell phone

numbers. (Id. at 38:17–39:2.) On June 5, 2009, Marciano was at school when she received a

text message from Defendant asking if she was at work. (Id. at 39:6–40:18) She responded via

text message that she was at school. (Id.) Her Verizon cell phone records were admitted into

evidence at trial. They include the pertinent text messages. (Id. at 43:4-18.) Marciano identified

the text message sent to her from Defendant's phone number at 12:58 p.m. on June 5, 2009

asking her if she was at work. (Id.)

3.     *Therry Schwartz*

Therry Schwartz is the manager of the Exxon. (12/2/10 Tr. at 46:7-19.) His duties

include inventory collection, store management, counting money, and "making sure the drawers

are straight." (Id. at 47:15-19.) Schwartz testified that each employee is required to do what is

called a "safe drop." It consists of placing money from their register into an envelope with their

name on it and putting it into a safe. (Id. at 47:12-15.) The next day, Schwartz takes the

envelopes out of the safe and accounts for the money. (Id. at 47:16-18.)

On June 6, 2009, Schwartz was working at the Exxon. (Id. at 46:18-24.) He collected the

envelopes that were in the safe and separated the money by employee. (Id. at 48:5-9.) Schwartz

noticed that some of the bills looked red instead of green. (Id. at 48:10-12.) The red bills were

suspicious looking, prompting him to call the police. (Id. at 48:25–49:4.) Schwartz turned over

to the police approximately $300 in soiled red bills. (Id. at 49:5-10.) At trial, Schwartz

identified Government Exhibit 23 as the bills that he had surrendered. (Id. at 49:20–50:8.)

Schwartz testified about the security system at the Exxon. The purpose of the security

system is mainly to deter employees from stealing. (Id. at 51:1-8.) Video cameras are set up at angles that monitor the cashiers working at the registers. (Id.) The video is digital and is backed-up on a hard drive that is retained for fourteen days. (Id. at 51:9-16.) At the request of the police, Schwartz reviewed the videos recorded on June 5, 2009. (Id. at 51:17-20.) On the videos, Schwartz observed a customer at register number two handing bills to the cashier and the cashier returning different bills in exchange. (Id. at 51:24–52:30.) The cashier at register number two was Josephine Soriano. (Id.)

4. *Josephine Soriano*

Josephine Soriano is a former employee of the Exxon. (12/2/10 Tr. at 54:11-18.) She was employed as a cashier in June 2009. (Id. at 54:23-24.) Soriano knew Defendant as a regular customer. (Id. at 55:13-17.) She knew him by his nickname, "Pip." (Id. at 59:3-9.) Soriano was working on June 5, 2009. (Id. at 55:18-24.) At approximately 1:30 p.m., Defendant entered the Exxon and asked Soriano if she would exchange money for him. (Id. at 55:18-7.) Defendant wanted to exchange large bills stained around the edges for clean bills. (Id. at 56:18-20) Soriano testified that the bills were stained a pinkish-red color. (Id. at 56:21-23.) She exchanged the bills, which totaled approximately $300. (Id. at 56:24–57:4.) Defendant asked her to exchange more money, but Soriano refused. She placed the soiled money in her register and then later put it in an envelope and made a "safe drop." (Id. at 57:5-14.)

At trial, Soriano reviewed Government Exhibits 24 to 32, which are moving and still surveillance images from the cameras in the Exxon on June 5, 2009. (Id. at 58:13–66:11.) They show Defendant driving up to the Exxon, entering, exchanging money, looking around, leaving, reentering, and ultimately driving off. (Id.) Soriano identified herself talking to Defendant and

then exchanging money for him.  (Id.)  Soriano also examined Government Exhibit 33, a "photo

array" shown to Soriano by the police on June 6, 2009, which contained eight potential suspects.

Soriano had circled the photograph of Defendant, identifying him as the man who had exchanged

money at the Exxon.  (Id. at 66:15–68:9.)

C.     Testimony Of Investigators[3]

On June 5, 2009, shortly after the robbery, officers arrived at the Bank to conduct an

investigation.  They moved witnesses to a secure location in the Bank where they could be

monitored and were warned not to speak to each other or to discuss what had transpired.

(12/2/10 Tr. at 82:12-20.)  The officers obtained the Bank surveillance videos and released to the

local media information regarding the particulars of the robbery as well as still photographs

derived from the surveillance videos.  (Id. at 82:21–83:5; 83:18-24.)

On June 6, 2009, investigators went to the Exxon and viewed surveillance videos

recorded there on June 5, 2009, which were played for the jury.  (Id. at 84:11–85:11, 21-24.)  The

videos show Defendant entering and exiting the Exxon multiple times and also show Defendant

exchanging money with Soriano.  (Id. at 86:8-13.)  They show Defendant in a green Chevy

Malibu, pulling out of the Exxon parking lot.[4]  (Id. at 87:17–88:1.)  While at the Exxon,

_____

[3]     The investigators who testified at trial were: Matthew Gerould, an inspector with
the City of Easton Police Department; George Volpe, a deputy sheriff in the warrant unit of the
Northampton County Sheriff's Department; John Harmon, a sergeant with the Colonial Regional
Police Department; John Piperato, a police officer in the patrol division of the Easton Police
Department; Joseph Alonzo, a detective with the Easton Police Department and the lead
detective in the robbery investigation; and Michael Rickenbach, a forensic chemist with the
Federal Bureau of Investigation (FBI), who was qualified as an expert in forensic chemistry and
bank dye analysis.

[4]     On April 24, 2008, Defendant was stopped by police for running a stop sign in the
same Chevy Malibu.  (Id. at 134:6-10.)  At the time, Defendant informed the police officer that

investigators interviewed Josephine Soriano, Therry Schwartz, and Heather Marciano.  (Id. at 144:12-20.)

On June 7, 2009, an inspector located the green Chevy Malibu outside the home of Defendant's girlfriend.  (Id. at 90:5-9.)  From the outside of the vehicle, the investigator observed red stains that appeared to be dye on a vertical part of the front-passenger seat that faced the driver's side, as well as on the seat itself.  (Id. at 90:17-24.)  The vehicle was secured, searched, and processed for evidence.  (Id. at 96:19–97:3.)  At trial, the jury viewed Government Exhibits 34-37, photographs of the green Chevy Malibu that had been impounded.  (Id. at 91:5-20.)  The photographs revealed red stains on the upholstery of the vehicle.  (Id. at 95:11-20.)  Swatches of upholstery were removed and sent to an FBI laboratory for forensic testing.  (Id. at 151:17-21.)

On June 8, 2009, investigators returned to the Bank to re-interview the tellers.  (Id. at 97:14-17.)  They spoke to teller Shaprese Thomas and showed her a photo array containing photographs of eight possible suspects.  Thomas circled the photograph of Defendant, identifying him as the man who robbed the Bank on June 5, 2009.[5]  (Id. at 98:3-23.)  Thereafter, investigators obtained an arrest warrant for Defendant and again contacted the media, circulating a photograph of Defendant.  (Id. at 99:1-23.)

On June 9, 2009, one of the investigators, received a voicemail message at his office from Defendant who stated that he intended to turn himself in on Friday, June 12, 2009.[6]  (Id. at 101:1-

_____

the car belonged to his girlfriend and that he drove it often.  (Id. at 135:7-16.)

[5]      This array was admitted into evidence as Government Exhibit 20.

[6]      At trial, the message was played for the jury and the recording was admitted into evidence as Government Exhibit 38.  The message was:  "Yeah, listen, (indiscernible), this is [Defendant] Markeith calling.  I was calling to let you know that (indiscernible) motherf***ing

22; 103:7-11.)  Defendant did not appear that Friday.  (Id. at 103:14-24.)

On June 15, 2009, Defendant was arrested in Bath, Pennsylvania, in Northampton County, approximately twenty minutes driving time from Easton, Pennsylvania.  (Id. at 122:22-25.)  Defendant was sitting in the passenger seat of a red Dodge Avenger.  (Id. at 123:1-10.)  A total of $492 of red dye-stained bills was recovered from the Avenger.[7]  (Id. at 154 12-18.)  The car was taken into custody for processing and the money was retrieved and sent to the FBI laboratory for analysis.  (Id. at 123:13-25; 130:9-19.)

FBI forensic testing revealed that the swatches of upholstery from the Chevy Malibu, the bills retrieved from the Exxon, and the bills taken from the Avenger all contained traces of dye and tear gas that are used in bank security packets.  (Id. at 179:20–180:22.)

At trial, two investigators identified Defendant in the courtroom as Markeith Webb.  One investigator knew Defendant prior to the robbery and knew him by his nickname "Pip."  (Id. at 86:17-25; at 87:1-9.)  The other investigator recognized Defendant as the man he had arrested on June 15, 2009.  (Id. at 124:22–125:6.)  Still another investigator testified that he knew Defendant to be the grandson of Mattie Graham.  (Id. at 155:3-11.)

## III.  DEFENDANT'S MOTION FOR ACQUITTAL PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 29(c)(1)

### A.  Legal Standard

It is well-settled that a defendant bears a heavy burden to prevail on a motion for

---

news every day, (indiscernible) every f***ing day.  I explained to them (indiscernible) there Friday.  So (indiscernible) tomorrow or the next day, I don't give a f***.  I'll still be there Friday. So you can kiss my a**.  See you Friday."

[7]     The bills were admitted into evidence as Government Exhibits 41-A and 41-B.

judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29.  See United States v. Haywood, 363 F.3d 200, 204 n.3 (3d Cir. 2004).  When considering a Rule 29 motion, a court must view the evidence and the reasonable inferences drawn therefrom in the light most favorable to the Government, in order to determine whether a rational trier of fact could find the defendant guilty beyond a reasonable doubt.  See United States v. Brodie, 403 F.3d 123, 133 (3d Cir. 2005); United States v. Gonzalez, 918 F.2d 1129, 1132 (3d Cir. 1990).  In determining the sufficiency of the evidence, the Court does not weigh the evidence or determine the credibility of witnesses.  See Haywood, 363 F.3d 200 at 304 n.3.  A finding of insufficiency of the evidence is confined to the rare cases where the Government's failure of proof is "clear."  Id.; United States v. Smith, 294 F.3d 473, 477 (3d Cir. 2002).

B.      Analysis

Defendant is charged with armed bank robbery in violation of 18 U.S.C. § 2113(d) (Count One), and use of a firearm in connection with a crime of violence in violation of 18 U.S.C. § 924(c)(1) (Count Two).  With regard to Count One, Defendant posits two arguments: (1) the evidence presented at trial failed to establish that Defendant was the perpetrator of the bank robbery; and (2) the evidence presented at trial was insufficient to connect the red dye-stained money in Defendant's possession to the money taken from the Bank.  (Doc. No. 90 at 5.) According to Defendant, no rational jury could find him guilty beyond a reasonable doubt on Count One, charging armed bank robbery in violation of 18 U.S.C. § 2113(d).  (Id.)

With regard to Count Two, Defendant posits two arguments: (1) the evidence presented at trial failed to establish that Defendant was the perpetrator of the Bank robbery; and (2) the evidence was insufficient to prove beyond a reasonable doubt that the weapon used in the

robbery was a firearm as defined by statute.[8]  Defendant contends that no rational jury could find that he was guilty beyond a reasonable doubt on Count Two, charging use of a firearm in connection with a crime of violence in violation of 18 U.S.C. § 924(c)(1).

> 1.  *Count One: Armed bank robbery*

Defendant's contentions about the sufficiency of the Government's evidence are unavailing.  The evidence was sufficient to establish that Defendant was the robber, and a rational jury could find Defendant guilty beyond a reasonable doubt on both counts.

In order to establish Defendant's guilt on Count One, the Government was required to prove each of the following elements beyond a reasonable doubt:  (1) Defendant knowingly took money that was in the care, custody, or possession of Lafayette Ambassador Bank while a bank employee or a customer was present; (2) Defendant used force and violence or intimidation; (3) Defendant intentionally assaulted or put in jeopardy the life of a bank employee or a customer by the use of a dangerous weapon while taking the money; and (4) at the time of the robbery, the deposits of Lafayette Ambassador Bank were insured by the Federal Deposit Insurance

---

[8]      On Count Two, the Government had the burden of proving beyond a reasonable doubt that the weapon used in the robbery was a "firearm" as defined in the pertinent statute. The statute defines a firearm as:

> (A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive;
> (B) the frame or receiver of any such weapon;
> (C) any firearm muffler or firearm silencer; or
> (D) any destructive device. Such term does not include an antique firearm.

18 U.S.C. § 921(a)(3).

Corporation.[9]  See Model Jury Instructions, Criminal, Third Circuit, § 6.18.2113D; (12/3/10 Tr. at 63:10–64:1).

Defendant does not claim that the Government failed to establish all of the elements beyond a reasonable doubt, only that the Government failed to establish that it was Defendant who carried out the crime.  Viewing the evidence in the light most favorable to the Government, there is ample evidence to connect Defendant to the robbery.  Three witnesses, Joseph Lombardo, Sally Chrin, and Shaprese Thomas, testified that the perpetrator's mask fell slightly during the robbery, exposing a portion of his face.  (12/1/10 Tr. at 112:14-17; 148:20–149:2; 169:8:-18.)  Thomas stated that her glimpse of his face triggered something in her memory and she realized that she recognized the perpetrator as the grandson of a customer of the Bank, who had visited the Bank on prior occasions with his grandmother.  (Id. at 172:4-16.)  Three days after the robbery, Thomas identified Defendant in a photo array as the man who robbed the Bank. (12/2/10 Tr. at 98:3-23.)  Chrin testified that hearing the perpetrator's voice triggered something in her memory and she recognized the perpetrator as the grandson of a customer of the Bank, Mattie Graham.  (12/1/10 Tr. at 149:7-22.)  Evidence showed that Defendant is the grandson of Mattie Graham, (12/2/10 Tr. at 155:3-11), and that Mattie Graham was a customer at the time of the robbery.  (12/2/10 Tr. at 18:14–20:12.)

The Government presented to the jury surveillance videos that depicted the robbery and

---

[9]     The jury was instructed that the Government had the burden to prove each of the four elements beyond a reasonable doubt.  (12/3/10 Tr. at 63:10-13.)  The jury was also instructed on the meaning of the terms bank, intimidation, assault, dangerous weapon, use of a dangerous weapon, care, custody, control, management, and possession of the bank, in accordance with the Third Circuit Model Jury Instructions.  (Id. at 64:2–65:20.)  The jury was instructed that on Count One, the Government did not have the burden to prove that the weapon was actually capable of inflicting bodily harm.  (Id. at 64:23–65:1.)

the whereabouts of each witness in relation to the perpetrator.  (12/1/10 Tr. at 74:1–80:24.)  The

surveillance videos corroborated the testimony of the witnesses as to what transpired at the Bank

on June 5, 2009.  The witnesses also testified that the security packet containing red dye and tear

gas taken by the robber exploded while he was running from the Bank.

The Government showed surveillance videos from the Exxon, taken approximately two

hours after the robbery, showing Defendant, unmasked, exchanging money.  (12/2/10 Tr. at

58:13–66:11.)  Heather Marciano testified that she was friendly with Defendant, he knew she

worked at the Exxon, and he sent her a text message on June 5, 2009, after the time of the

robbery, asking if she was at work.  Josephine Soriano, testified that she knew Defendant as a

regular customer of the Exxon, that she knew his nickname, Pip, and that Pip exchanged red

stained money for clean money two hours after the robbery.  (Id. at 55:13–55:9.)

Therry Schwartz testified that the day after the robbery he discovered the red dye-stained

money at the Exxon and turned it over to the police.  The money was tested at an FBI laboratory

and an expert from the FBI testified that the money contained traces of red dye and tear gas used

in bank security packets.  (Id. at 179:20–180:22.)

Inspector Gerould testified that two days following the robbery, he located the Chevy

Malibu driven by Defendant on the morning of the robbery as was seen in the convenience store

video recording.[10]  (12/2/10 Tr. at 90:5–91:4.)  The upholstery of the Malibu was tested at the

FBI forensics laboratory and was determined to contain red dye and tear gas used in bank security

devices.  (Id. at 179:20–180:22.)  The Government played for the jury a voice mail left by

---

[10]        Officer Piperato testified that he had stopped Defendant, driving the same vehicle,
one year earlier in a routine traffic stop.  (Id. at 134:6–135:8.)

Defendant for Inspector Gerould, mocking the officer and promising to surrender. (Id. at 101:1–103:24.) Defendant did not surrender but when he was ultimately arrested, the police found red dye-stained money in his possession and the Government presented evidence that this money too was contaminated with red dye and tear gas. (Id. at 122–125; 79:20–180:22.)

Viewing the evidence and reasonable inferences drawn therefrom in the light most favorable to the Government, there is sufficient evidence to support a rational jury's finding that the Government proved beyond a reasonable doubt that Defendant was the man who robbed the Bank.

Defendant next argues that the evidence was not sufficient to establish that the red dye-stained money that Defendant exchanged at the Exxon was directly linked to the Bank. Defendant claims that without evidence definitively tying the serial numbers on the stolen money to the money that had been in the possession of the Bank, the Government's case connecting the stolen money to the Bank is "no more than weak, circumstantial evidence that did not overcome the Government's failure of proof." (Doc. No. 90 at 5.) This argument overlooks well-established law that direct evidence is not required to carry the burden of proof and that circumstantial evidence is sufficient. Model Jury Instructions, Criminal, Third Circuit § 3.03; Breighner v. Chesney, 156 Fed. App'x. 539, 541 (3d Cir. 2005) ("[C]ircumstantial evidence by itself may suffice for a finding of guilt beyond a reasonable doubt" (citing Jackson v. Virginia, 443 U.S. 307, 324-325 (1979))); see also U.S. v. McCurry, 248 F.2d 116, 116 (3d Cir.1957). The jury was instructed on these principles in the jury instructions. (12/3/10 Tr. at 49:6-20.)

Circumstantial evidence presented at trial was sufficient for a rational jury to conclude that Defendant was the robber and that he possessed the money that was taken from the Bank.

Eye-witness testimony identified Defendant as the perpetrator. A packet with red dye in the possession of the robber exploded as he ran from the Bank. Defendant exchanged money stained with red-dye contained in a bank security packet for clean money at the Exxon convenience store within two hours of the robbery. The Chevy Malibu that Defendant was seen driving on several occasions, which belonged to his girlfriend, had red dye and tear gas on the passenger seat from a bank security packet that had been triggered. When Defendant was arrested on June 15, 2010, he was a passenger in another vehicle that contained $492 in bills stained with red dye also derived from a bank security packet. The confluence of these events is sufficient to raise the inference that the red dye-stained money in the possession of Defendant came from the June 5, 2009 robbery of the Bank. Accordingly, the evidence is sufficient to sustain the verdict on Count One.

2. *Count Two: Use of a firearm in connection with a crime of violence*

In order to establish Defendant's guilt on Count Two, the Government was required to prove each of the following elements beyond a reasonable doubt: (1) Defendant committed the crime of armed bank robbery as charged in Count One; (2) during and in relation to the commission of that crime, Defendant knowingly used and carried a firearm;[11] (3) Defendant used and carried the firearm during and in relation to the crime of armed bank robbery as charged in Count One;[12] and (4) that the weapon carried by Defendant was a firearm as defined by statute,

---

[11] The jury was instructed that "during and in relation to" means that the firearm must have had some purpose or effect with respect to the crime of violence. The firearm must have at least facilitated or had the potential to facilitate the crime of violence. (12/3/10 Tr. at 67:8-12.)

[12] The jury was instructed that the phrase "uses or carries a firearm" means having a firearm, or firearms, available to assist or aid in the commission of the crime of violence. "Use" means more than mere possession of a firearm by a person who commits a crime; to establish use, the government must show active employment of the firearm. If the defendant did not either

*i.e.* "any weapon which will expel, or is designed to or may readily be converted to expel, a projectile by the action of an explosive." See Third Circuit Model jury Instruction (Criminal) 6.18.924B.

The evidence presented by the Government was sufficient to establish that Defendant used a firearm in connection with a crime of violence and a rational jury could find Defendant's guilt beyond a reasonable doubt.

Defendant's first attack on Count Two is the sufficiency of the evidence to prove that Defendant was the perpetrator. The Court has already found, *supra*, that the Government presented sufficient evidence at trial to prove beyond a reasonable doubt that Defendant committed the crime of armed bank robbery, as charged in Count One of the Superseding Indictment.

Defendant's next argument with regard to Count Two is that the Government did not present sufficient evidence to establish that he carried a firearm as defined by the statute.[13]

_____

disclose or mention the firearm or actively employ it, the defendant did not use the firearm. "Carry," on the other hand, means that the defendant possessed the firearm. (12/3/10 Tr. at 66:18–67:3.)

[13]    The Government presented sufficient evidence to prove the second element of the offense beyond a reasonable doubt – that during and in relation to the commission of that crime, Defendant knowingly used and carried a firearm. As defined in the Model Jury Instructions, to establish "use," the Government was required to establish "active employment of the firearm." In his Motion, Defendant does not dispute that the Government met its burden on this element. In any event, the trial record is clear that the Government proffered sufficient evidence to establish that Defendant "used" the firearm. Defendant threatened to shoot Lombardo, (12/1/10 Tr. at 115:3-7), and pointed the gun at Chrin and Lombardo in a threatening manner, (Id. at 115:1-7), thereby actively employing it. Defendant also does not dispute that the Government met its burden to establish the third element of the offense – that the firearm had at least facilitated or had the potential to facilitate the crime of violence. The same evidence that establishes "use" establishes the facilitation factor as well.

Defendant asserts that no firearm was recovered and that the Government relied only upon the testimony of one witness, customer Joseph Lombardo, to prove that the weapon carried by Defendant was a gun. (Doc. No. 90 at 5.) In fact, Defendant does not attack the substance of Lombardo's testimony – that he determined that Defendant carried a gun based on his many years of experience handling firearms. Rather, Defendant asserts only that Lombardo was not a credible witness. (Id. at 6.) However, on a motion for judgment of acquittal, the Court does not weigh the credibility of witnesses, but determines if the evidence, when viewed in the light most favorable to the Government, is sufficient to sustain the verdict.

Here, the Government's evidence was not "weak," as alleged by Defendant. Lombardo, a man with approximately fifty years experience with firearms, testified that the weapon possessed by the perpetrator was an actual handgun. (Id. at 118:2-4.) He described the weapon as being made of metal and noted from its appearance that a serial number had been worn away. (Id.) Teller Jimenez corroborated the testimony that the weapon was made of metal, (id. at 63:1–64:17), and other tellers said that the robber possessed a handgun. Bank surveillance videos show the presence of a gun in the hand of the perpetrator. Although the weapon was never recovered, the evidence still shows that Defendant used a firearm during the robbery. See United States v. Lawton, 66 Fed. App'x 323, 324-45 (3d Cir. 2003) (finding sufficient evidence of a "firearm" where witness testified to extensive experience with firearms as a gun collector and in the military and the witness had a clear view of the "firearm" at close range during the crime); see also United States v. Beverly, 99 F.3d 570, 572-73 (3d Cir. 1996); Parker v. United States, 801 F.2d 1382 (D.C. Cir. 1986). Since there is no legal basis for the Court to overturn the verdict of the jury, Defendant's Motion for Judgment of Acquittal Pursuant to Federal Rule of

Criminal Procedure 29 will be denied.

## IV.  DEFENDANT'S MOTION FOR NEW TRIAL PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 33

### A.  Legal Standard

Defendant also argues that a new trial is warranted in this case.  Under Federal Rule of

Criminal Procedure 33, a court may vacate a criminal judgment and grant a new trial "if the

interest of justice so requires."  Fed. R. Crim. P. 33(a).  The Court has carefully considered each

argument made by Defendant in support of his claim that a new trial is warranted.  Each one is

unpersuasive and the Motion for a New Trial will be denied for reasons that follow.

### B.  Defendant's Arguments For A New trial

#### 1.  *Purposeful discrimination in jury selection*

On November 30, 2010, a jury of twelve persons plus two alternates was chosen from an

initial venire panel of fifty randomly selected potential jurors.  The venire panel included three

persons who appeared to be of African American decent (venire jurors numbered 12, 47, and 49,

respectively).  Counsel for Defendant objected to the venire panel on the basis that the panel did

not reflect a proper racial balance because only about six percent of the panel was African

American.  The Court overruled the objection because the venire panel was properly selected in

accordance with the procedures of the U.S. District Court for the Eastern District of

Pennsylvania.

The Court then proceeded to ask several questions of the panel as a whole, requesting that

each panelist with a response raise his or her hand and state his or her name for the record.

Thereafter, those panelists who had raised their hand were subject to individual *voir dire* by the

Court, the Government, and counsel for Defendant, outside the presence of the panel at large.[14] Following the individual *voir dire*, the parties exercised their peremptory challenges on the first thirty-two potential jurors from the panel of fifty.[15]  The Government exercised a challenge on petit jurors 12 and 47.  Panelist 49 was not within the first thirty-two potential jurors and was eliminated as a potential juror for this reason.  Therefore, the trial jury consisted of twelve jurors and two alternate jurors, none of whom were African American.

With the consent of the parties, the jury was sworn-in.  (12/1/10 Tr at 5:14-19.)  The Court then gave the jury preliminary instructions regarding their duty as jurors.  (Id. at 5:23–23:13.)  After the jury had been released for a luncheon recess, counsel for Defendant raised a challenge to the Government's use of peremptory challenges, alleging that the Government struck petit jurors 12 and 47 "so that the jury panel, as now constituted, is a totally Caucasian jury."  (Id. at 23:20–24:11.)  The Court construed the objection as a challenge under Batson v. Kentucky, 476 U.S. 79 (1986) and set forth the standard for evaluating a Batson challenge.  The Court stated that the evaluation must start with a determination of whether the challenging party has made a *prima facie* showing of a violation and if the Court finds that such a showing has been made, then the Court would require the challenged party to advance facially neutral reasons for exercising the peremptory challenges.  If the challenged party does so and meets its burden, the Court would next provide the challenging party with an opportunity to

---

[14]       Defendant was present for the individual *voir dire*.

[15]       In accordance with the Federal Rules of Criminal Procedure, the Government exercised six peremptory challenges and Defendant exercised ten.  See Fed. R. Crim. P. 24(b)(2). With regard to alternate jurors, Defendant and the Government each exercised one peremptory challenge.  Fed. R. Crim. P. 24(c)(4)(a).  This totals eighteen strikes.  Twelve jurors and two alternates were seated.  Thus, the jury was selected from the first thirty-two jurors on the panel.

establish pretext.  (Id. at 24:12–25:3.)  The Court explained that the standard to determine the first element – whether a prima facie showing of discrimination has been made – includes five relevant factors: the number of racial group members in the venire panel, the nature of the crime, the race of Defendant and victim, a pattern of strikes against members of a racial group, and the prosecutor's questions and statements during voir dire.  (Id. at 25:4-22.)

The Court found that the first element was met and that Defendant had made a *prima facie* showing of discrimination.  Next, the Court held that the Government adequately proffered facially neutral reasons for exercising its peremptory challenges to strike petit jurors 12 and 47 and that Defendant did not establish that the strikes were pretextual.  Consequently, the Court denied Defendant's Motion.  (Id. at 34:3–38:24.)

In his post-trial Motion, Defendant again alleges that the Government engaged in "purposeful discrimination" in jury selection in violation of Batson v. Kentucky, and that this discrimination warrants a new trial.  (Doc. No. 90 at 6.)  Defendant makes the same argument he made at trial.  After consideration of the record and the post-trial Motion, the Court declines to change its ruling.  The Government did not engage in purposeful discrimination in jury selection such that the "interest of justice" warrants a new trial.[16]

---

[16]      In its opposing brief, the Government asserts that Defendant waived his Batson challenge because he first raised it only after the jury had been sworn and given instructions. (Doc. No. 100 at 21-22.)  The Government raised the same objection at trial immediately following Defendant's Batson challenge.  (12/1/10 Tr. at 26:21–27:2.)  At trial, the Court noted that there is case law supporting the Government's argument that a Batson challenge is untimely unless made before the jury is sworn.  (Id. at 38:3-13.)  However, the Court cited United States v. Thompson, 827 F. 2d 1254, 1257 (9th Cir. 1987) for the proposition that, under certain circumstances, an objection made after the jury has been sworn can be timely.  (Id. at 38:13-17.)  The Court deemed Defendant's Batson challenge to be timely because Defendant raised the challenge moments after the jury was sworn and instructed.  (Id. at 38:18-24)  The Court makes the same finding here.  The Government suffered no prejudice from Defendant's short delay in

The Equal Protection Clause "prohibits a prosecutor from using a peremptory challenge to strike a prospective juror solely on account of race." Holloway v. Horn, 355 F.3d 707, 719 (3d Cir. 2004) (citing Batson, 476 U.S. at 88, 106 S.Ct. 1712). "As in any equal protection case, the burden is . . . on the defendant who alleges discriminatory selection of the venire to prove the existence of purposeful discrimination." Batson, 476 U.S. at 93, 106 S.Ct. 1712 (internal citations and quotations omitted). Batson, "establish[ed] a three-step inquiry for determining the constitutionality of challenged peremptory strikes." Coombs v. Diguglielmo, 616 F.3d 255, 262 (3d Cir. 2010) (citing Hardcastle v. Horn, 368 F.3d 246, 255 (3d Cir.2004)). When a Batson challenge is raised, "[f]irst, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge on the basis of race." Id. (citing Rice v. Collins, 546 U.S. 333, 338 (2006)). "Second, if the showing is made, the burden shifts to the prosecutor to present a race-neutral explanation for striking the juror in question." Id. (citing Batson, 476 U.S. at 97-98). "Third, the court must then determine whether the defendant has carried his burden of proving purposeful discrimination." Id. (citing Batson, 476 U.S. at 98, 106 S.Ct. 1712). The Court followed this procedure here in finding that there was no violation of Batson.

The Government exercised peremptory challenges to remove the two potential African American jurors, Nos. 12 and 47. Because this equates to striking one-hundred percent of the available African American jurors from the first thirty-two jurors in this case, it is sufficient to establish a "pattern" of discrimination and a *prima facie* showing of a violation. (Id. at 25:4-22.) However, the Government has adequately articulated facially neutral reasons for exercising its

objecting.

peremptory challenges and Defendant has failed to prove pretext.  See United States v. Milan, 304 F.3d 273, 281 (3d Cir. 2002); Purkett v. Elm, 514 U.S. 765, 768 (1995).  The Government struck venire juror 12 because during *voir dire* she said that her son had been charged with a firearms related crime and was imprisoned as a result.  She stated that she felt her son had been treated unfairly by the police and the prosecution.  Defendant posits that because venire juror 12 also reported being a victim of a crime, the two factors "offset each other."  (Doc. No. 90 at 7.) However, the Government has the right to use a peremptory challenge to strike a potential juror with a known bias against the police.  See, e.g., United States v. Mack, 78 Fed. App'x 171, 189 (3d Cir. 2003) (finding use of peremptory challenge against potential juror with bias against her estranged husband, a police officer, facially neutral),  United States v. Houston, 456 F.3d 1328, 1336-1337 (11th Cir. 2006); United States v. Bauer, 84 F.3d 1549, 1554-1565 (9th Cir,. 1996).

The Government used another peremptory challenge to strike venire juror 47.  This potential juror did not respond to any of the general questions posed by the Court.  According to the Government, potential juror 47 was struck because of his occupation as a engineer.[17]  The prosecutor explained that it is his practice to routinely strike engineers and other potential jurors with scientific backgrounds because of his preference for jurors who will decide a case based on feelings rather than mathematics or precise calculations.  (Doc. No. 100 at 23-24.)  Defendant counters this argument by noting that, because the potential juror was never questioned, he remains a "complete cipher" and the only plausible reason for striking him is racially motivated. (Doc. No. 90 at 7.)

---

[17]     Although the potential juror did not answer any questions, his occupation was listed along with his name, age, marital status, spouse's occupation, and county of residence on a document provided to the Court and counsel.

Defendant's argument in support of his <u>Batson</u> challenge is speculative at best and does not meet his burden to prove pretext. <u>See</u> <u>United States v. Milan</u>, 304 F.3d 273, 281 (3d Cir. 2002). Striking a juror based on his occupation is within a prosecutor's prerogative. <u>Forrest v. Beloit Corp.</u>, 424 F.3d 344, 346 (3d Cir. 2005) (finding that Government's use of peremptory strike based on potential juror's occupation was facially neutral and not pretext); <u>see also</u> <u>Hall v. Leubbers</u>, 341 F.3d 706, 713 (8th Cir. 2003); <u>United States v. Thompson</u>, 827 F.2d 1254, 1260 (9th Cir. 1987) ("Excluding jurors because of their profession ... is wholly within the prosecutor's prerogative."). Accordingly, Defendant has failed to establish that a constitutional error occurred in jury selection, and the Court will not grant a new trial on this basis.

### 2. *The denial of the Restated <u>Franks</u> Motion*

In his Motion for New trial pursuant to Rule 33, Defendant avers that the Court abused its discretion by denying Defendant's Restated Motion for <u>Franks</u> Hearing (Doc. No. 57) and that this merits a new trial. Defendant raises no new arguments in his post-trial Motion beyond those already raised in his Restated <u>Franks</u> Motion. The Court carefully reviewed the pleadings filed by Defendant and the Government at that time (Doc. Nos. 57-58) and issued an Opinion on the <u>Franks</u> claim on November 24, 2010 (Doc. No. 74). The Court adopts here its prior Opinion as the law of the case.

### 3. *The proffer letter*

Defendant contends that he also has the right to a new trial because the proffer letter he received from the Government before trial is an unenforceable, illusory contract, and the threat of the proffer information being used against him at trial limited his defense. (Doc. No. 90 at 9-10.) Defendant concedes that the proffer letter that he signed is the standard letter used by the

Government in the Eastern District of Pennsylvania.  (Id. at 4.)  Defendant claims that proffer

letters in general are inherently illusory and unenforceable.  This theory is contradicted by well-

settled case law.  The Supreme Court has held that evidentiary waivers are valid.  See United

States v. Mezzanatto, 513 U.S. 196, 201-03 (1995) ("[A]greements to waive evidentiary rules are

generally enforceable even over a party's subsequent objections.").  A criminal defendant can

waive his evidentiary rights as long as there is no "affirmative indication that the agreement [to

waive] was entered into unknowingly or involuntarily."  Id. at 210.  Further, the Third Circuit has

clarified that proffer admissions can be used to rebut contradictory evidence and theories

proffered by a defendant at trial.  See United States v. Hardwick, 544 F. 3d 565, 569-72 (3d Cir.

2008).

Defendant, accompanied by counsel, met with the Government and pursuant to the

proffer letter signed by the Government, Defendant, and his counsel, provided information about

the events of June 5, 2009.  Defendant argues that supplying information to the Government

hindered his defense at trial because if he were to "open to the door" to certain topics, the

Government would be permitted to use proffered information as rebuttal evidence against him.

In light of precedent, and the fact that there is no evidence that Defendant entered into the

proffer agreement unknowingly or involuntarily (in fact, he was represented by counsel who co-

signed the letter), the Court cannot find that the proffer letter is unenforceable.  Moreover, there

is no evidence that Defendant's ability to present a defense was hindered by the proffered

information.  In fact, the Court overruled a Motion made by the Government to present such

information at trial.  (12/2/10 Tr. at 72:4–78:8.)  The Court found that Defendant had not

presented contradictory information and had not "crossed the line."  (Id.)  Defendant freely

entered into a valid proffer agreement and although he could not present evidence at trial that would contradict the proffered information without facing rebuttal by the Government, his defense at trial was not hindered.

4. *Destruction of exculpatory evidence*

Finally, Defendant argues that the Easton Police Department destroyed exculpatory evidence and that the absence of this evidence warrants a new trial.[18] The loss of potentially exculpatory evidence attributable to the Government is governed by Arizona v. Youngblood, 488 U.S. 51 (1988).[19] Establishing a due process violation under Youngblood requires a showing of bad faith by the Government. Id. at 58 ("We therefore hold that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law."). Moreover, prosecutorial misconduct is only actionable if there is prejudice to the defendant. See Bank of Nova Scotia v. United States, 108 S. Ct. 2369, 2373 (1988) ("We hold that, as a general matter, a district court may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendants.")

---

[18]    The Government points out in its brief – and counsel for Defendant agreed at oral argument – that a new trial is not the proper remedy when the Government destroys evidence, because the evidence allegedly destroyed cannot be retrieved and would not be available for use at a new trial. Rather, the proper inquiry is whether Defendant's due process rights have been violated and whether this violation should lead to dismissal of the Superceding Indictment.

[19]    In his Motion, Defendant characterizes this issue as one governed by the principles enunciated in Brady v. Maryland, 373 U.S. 83 (1963). Pursuant to Brady, the Government is required to disclose evidence that is favorable to the accused and material to either guilt or to punishment. Brady, 373 U.S. at 87. However, Defendant's claim is not that the Government failed to disclose exculpatory evidence, but rather that the Government lost or destroyed potentially exculpatory evidence. The duty to disclose potentially exculpatory evidence under Brady differs from the due process protection implicated by the loss or destruction of potentially exculpatory evidence. This issue is more appropriately reviewed under the principles enunciated in Youngblood.

At trial, Defendant presented evidence that shortly after the robbery teller Shaprese Thomas wrote a description of the perpetrator on an envelope and gave that envelope to Officer Jones. (12/1/10 Tr. at 188:3-24.) On cross-examination, Detective Alonzo testified that Officer Jones gave him the envelope. (12/2/11 Tr. at 160:7-9.) Detective Alonzo then compared the description of the perpetrator written on the envelope with the description written in a report generated by Officer Jones based on the information provided to him by Thomas, and determined that the descriptions were identical. Based on the comparison, Detective Alonzo did not retain the envelope as evidence. (Id. at 160:8-18.) Defendant speculates that Thomas did not include in her description on the envelope that Defendant's mask fell down as he jumped over the counter and that this omission is somehow exculpatory and should have been provided to the defense. However, Thomas also did not provide this fact to Officer Jones and it is not included in his report, which was admitted into evidence at trial as Defendant's Exhibit 3, and which the jury had ample opportunity to consider both at trial and during deliberations.

There is no evidence that Detective Alonzo did not retain the envelope in bad faith, which is required by Youngblood in order to make out a due process violation. Detective Alonzo testified that he received the envelope from Officer Jones, and that he compared the written description to the verbal statement given to Officer Jones by Thomas as recorded by Officer Jones in his report. Because the information was the same, he chose to discard the envelope. This evidence shows that the Detective made judgments about the management of the investigation. It does not prove that the Detective purposefully destroyed evidence in bad faith. See Youngblood, 488 U.S. at 58 (requiring a showing of bad faith by the police to substantiate a due process violation); Griffin v. Spratt, 969 F.2d 16, 19 n.1 (3d Cir. 1992) (applying

<u>Youngblood</u> and finding that "a criminal defendant does not have the right under due process to have all potentially exculpatory evidence preserved for trial . . . .").

Further, as required under <u>Bank of Nova Scotia</u>, there is no evidence that the failure to produce the envelope in any way prejudiced Defendant at trial. As stated *supra*, two witnesses testified at length about the envelope's contents and its destruction. The jury had ample opportunity to evaluate the credibility of the witnesses with respect to testimony about the envelope, and to evaluate the importance of the omission from Officer Jones' report of the fact that the mask fell down when the robber jumped over the counter.

Defendant alleges that the Government destroyed or suppressed two other items. The first is a "robbery kit form" that teller Shaprese Thomas started to fill out. The second is a signed statement by Jimenez. (Doc. No. 90 at 14-15.) There is no evidence that Thomas's robbery kit form was ever provided to the police. In fact, Thomas testified that although she began to fill out the robbery kit form, she stopped doing so when the police arrived, did not turn the form over to the police, and has no idea what happened to the form. (12/1/10 Tr. at 187:15–188:3.) Moreover, the lead detective investigating the robbery, who arrived at the Bank shortly after the robbery, testified that he was not aware of any teller having filled out a robbery kit form and no such form was ever provided to him. (12/2/10 Tr. at 161:22–162:3.) With regard to Jimenez's written statement, her testimony about a written statement was confusing at best, and she eventually clarified her testimony stating that she never provided the police with any written report – only a verbal one. (12/1/10 Tr. at 107:13-18.) Moreover, Detective Alonzo testified that no signed or written statements were obtained from any witness on the scene and that all information was verbally communicated by the witnesses to the officers. (12/2/10 Tr. at 163:13-

19.) This evidence was presented at trial and subject to cross-examination by defense counsel. These were matters considered by the jury, which had the sole prerogative to determine the weight to be afforded to this evidence.

Defendant has not met his burden to show that the police acted in bad faith or that he was prejudiced by the absence of evidence at trial. Defendant has not established a due process violation. For all of the above reasons, Defendant's Motion for a New Trial Pursuant to Federal Rule of Criminal Procedure 33 will be denied.

## V.  CONCLUSION

Because Defendant has not shown that the evidence was legally insufficient on Counts One and Two, and because Defendant has failed to establish that there was any prejudicial error before or during trial, the Court will deny Defendant's Motion for Judgment of Acquittal and/or New Trial Pursuant to Federal Rules of Criminal Procedure 29 and 33.

An appropriate Order follows.